[No. 3134–2.   Division Two.   January 17, 1979.]

THE STATE OF WASHINGTON, *Respondent*, v. MAE LEE
JONES, *Appellant*.

*C. C. Bridgewater, Jr.,* for appellant (appointed counsel for appeal).

*Henry Dunn, Prosecuting Attorney,* for respondent.

PETRIE, J.—Mae Lee Jones was convicted of possessing stolen property of a value in excess of $250, a class C felony defined by RCW 9A.56.160(1)(a) as second–degree possession. Following the trial court's denial of her alternative motions in arrest of judgment and for a new trial, she appealed to this court. She contends the trial court erred (1) by denying her motion to suppress evidence, and (2) by permitting the prosecution to present improper "value" evidence. We remand for resentencing pursuant to the gross misdemeanor defined by RCW 9A.56.170 as third–degree possession.

The suppression hearing in the case at bench was held prior to the adoption of CrR 3.6 which requires the hearing judge to enter finding of fact. Nevertheless, a reasonably reliable fact pattern can be discerned from an appellate review of the record.

On May 20, 1977, two police officers, in the course of investigating two "bad checks" apparently drawn by Mae Lee Jones on a closed account, and a report of a missing television set from the Dunes Motel in Cowlitz County, went to a residence occupied by Al Davis, his two minor children, and the defendant, Mae Lee Jones. The police knew that Ms. Jones was employed as a maid at the Dunes Motel. They encountered Mr. Davis outside the residence and advised him they were looking for Ms. Jones. When they inquired whether she had brought home a television set recently, he answered affirmatively and said, "Hey, if it is stolen, I don't want it . . . You guys come on in and look at it if you want."

The police entered the living room of the two–bedroom apartment and examined a relatively new 19–inch portable Quasar color television set with a "very basic, very plain" brown plastic finish. The serial number on the outside of the set had been removed. Davis advised the police he had to go to work, told them Ms. Jones was expected at 4 p.m., and said, "Why don't you come back and talk to her?"

The two officers left the apartment, went to the Dunes Motel, examined several of the motel's television sets, and concluded that they were "identical to the set that was in Mrs. Jones' residence." They were then informed that readily identifiable sheets and other types of bedding were also missing from the motel.

The police then returned to the Davis–Jones residence and waited outside for Ms. Jones. After waiting for approximately 2 hours, Sgt. Steve Scibelli knocked on the door, which was then opened by Davis' 13–year–old son. Scibelli identified himself and inquired whether Ms. Jones was at home. The lad replied, "No, she isn't. Won't you please come in?"

Scibelli entered the living room; and, looking through the open door of a bedroom, he saw a pile of laundry approximately 10 feet away. On top of the pile was a bed sheet with 3–inch–high lettering, which Scibelli could read, identifying it as property of International Dunes. By that time Detective Edwin Nelson had entered the apartment, and Scibelli said, "Ed, I think we have got stolen property here. I will secure the residence if you will go get a warrant." Before Nelson left, however, he peered through the ribs in the back of the television set and obtained the serial number imprinted on the inside of the set. He also looked (inadvertently?) through the open bedroom door and saw a sheet, a blanket and two pillows. Nelson was able to read the large lettering on the sheet, but he was not able (at that distance) to identify the blanket and pillows as property of the Dunes Motel.

Thereafter, Nelson obtained the search warrant, and on his return he and Scibelli (who had remained inside the

apartment with the teen–age boy) searched the apartment. They took into police custody the television set, a blanket, 2 pillows, 4 pillow cases, 3 bath towels, and 10 queen–size sheets. Some of the bedding and linen were in the bedroom and others (not specifically identified) were found "in the linen closet."

At trial, the executive secretary and office manager of International Dunes Company, a partnership, acknowledged that she could not express an opinion as to the retail or market value of the television set. Nevertheless, she was permitted to testify (1) that it had been purchased at a discounted wholesale value of $282 in April 1976; (2) that the company replaced sets every 5 years, taking a straight line accounting depreciation of 20 percent per year; and that the sets were then sold to a wholesale merchandiser at $60 to $85 per set. In an offer of proof, with the jury absent, she testified that she could only express "a personal opinion" as to fair market value of the set because she had no experience attempting to sell a 1–year–old television set and had no experience selling a Quasar set even after a 5–year use. She also testified that the sets were specially designed units for the motel industry with the controls not as easily accessible as models which are sold in the open market.

In the same "offer" she told the court that used motel linens have no market value and that the normal life of an individual item is 3 years. She was then permitted to testify as to the purchase price of the several items of linen seized by the police which had been purchased approximately a year before being taken into police custody.

These cost figures, depreciated in a straight line for 1 year, arguably produced a "value" in excess of $250 for the *combined* total of *all* items seized. There was no other testimony as to the value of the items taken from the apartment, but substantial evidence was admitted to prove that they were the property of the Dunes Motel.

We turn first to the search and seizure issue. The defendant concedes that the police officers' first entry into

the apartment was gained at the specific invitation of a cotenant with his express consent to search the television set. However, she contends (1) the officers' second entry, at the 13–year–old boy's invitation after he had advised the police that Ms. Jones was not at home, was an unlawful entry and did not constitute justification for the intrusion which preceded Scibelli's and Nelson's "plain view" observation of the sheet in the bedroom; (2) regardless of the sufficiency of the minor's consent to enter, there was no consent to Officer Nelson's subsequent "search" of the television set by peering through the ribs to find an identification number; and (3) Officer Scibelli's act of remaining in the apartment in order to "secure" the premises constituted an unlawful seizure of the property without benefit of the search warrant which Nelson subsequently obtained. The defendant also challenges the sufficiency and accuracy of the affidavit upon which the search warrant was issued. For the reasons set forth below, however, we do not reach the issues which challenge the affidavit.

We note at the outset that Davis' initial consent to enter the apartment and examine the television set did not constitute consent for a second entry and/or search, *McNear v. Rhay*, 65 Wn.2d 530, 398 P.2d 732 (1965); nor did it constitute a consent to search the entire apartment. *State v. Johnson*, 71 Wn.2d 239, 427 P.2d 705 (1967). However, we do note that Davis' departing comment: "Why don't you come back and talk to her?" at least manifested an intent to cooperate with the police investigation and tends to negate any indication that he would be distressed at his teen–age son's subsequent invitation to the police.

The minor's invitation was clearly only a consent to enter—not a consent to search. Indeed, the prosecution does not contend the invitation was a consent to search. Thus, we need only consider the legal sufficiency of a teen-ager's consent to *enter* premises; not a teen–ager's consent to *search* premises.

Some minors, simply by reason of their age or immaturity, may be incapable of consenting to a police

entry; others may be overawed and will permit entry despite strict parental instructions or admonitions not to permit an entry. The record in this case appears to be devoid of either impediment. In *Davis v. United States,* 327 F.2d 301 (9th Cir. 1964) the court upheld an invitation to enter extended to police by an 8–year–old girl, in the absence of any indication in the record that her opening the door and invitation to enter were not unusual or unexpected or unauthorized acts. We believe that is a sound rule to follow. Furthermore, it is reasonably clear in the case at bench that the officers entered the apartment peacefully and were not motivated primarily to search it. Accordingly, we hold that Officers Scibelli and Nelson were justifiably inside the apartment on their second visit.

Once justifiably inside, they were not required to ignore incriminating evidence which they inadvertently observed in plain view and immediately recognized as such evidence. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). Thus, when Scibelli inadvertently saw the sheet in the bedroom and read the large size lettering on it he could have then and there entered the bedroom and seized it. Despite both officers' protestations to the contrary, it seems apparent from a reading of the detailed information contained in Nelson's affidavit in support of the search warrant, that one, or both, of the officers did enter the bedroom in order to identify as incriminating evidence some of the other bedding and linen which was ultimately seized.

Regardless of whether or not either officer entered the bedroom, Scibelli's announcement that "I will secure the residence if you will go get a warrant" constituted a seizure of property in the apartment in and of itself. *State v. Bean,* 89 Wn.2d 467, 572 P.2d 1102 (1978). We recognize that in "securing" the house in *Bean,* the officers unlawfully entered after having had the house under surveillance; whereas, in the case at bench, the officers were already justifiably inside the premises. Nevertheless, we see no less "a de facto, inchoate seizure" of the defendant's property in

this case than in *Bean*. In the case at bench, absent some emergency which would otherwise require his remaining in the apartment, Scibelli's determination to continue inside the apartment while Nelson left to obtain the search warrant cannot reasonably be categorized as anything less than a constructive and effective seizure of the property which was ultimately and physically seized under color of the warrant.

Thus, if any of the property taken into police custody was taken in violation of the Fourth Amendment, the search warrant which was obtained *after* the "seizure" occurred did not convert an unlawful seizure into a constitutionally valid seizure. *State v. Bean, supra.*

We have already indicated that seizure of the one sheet, inadvertently observed and immediately recognized as incriminating evidence by Scibelli, was validly seized. We must next consider the validity of the seizure of the other property, particularly the items which were subsequently found "in the linen closet."

Neither of the officers contends that he inadvertently saw any bedding and linen in a linen closet from his position in the living room. Hence, the seizure cannot be upheld under the "plain view" exception of *Coolidge v. New Hampshire, supra.* The prosecution does not assert, nor are we aware of, any other exception which might be applied to the facts in this case to overcome the general presumption that warrantless seizures are constitutionally invalid.

Because we have already held that *all* the property taken into custody had been "seized" before Nelson obtained the warrant, we must also hold that at least the items found in the linen closet were unconstitutionally seized and should have been suppressed.

For reasons which will subsequently become obvious, we make no decision as to the validity of the seizure of the television set or of the remaining items of bedding and linen. Instead, we turn to the defendant's challenge to the "value" evidence.

Because we have held that at least one item of property was validly seized and that other property should have been suppressed, the "value" issue reduces to a question of whether or not the jury could, considering the value of the lawfully seized property, find the defendant guilty of possessing stolen property of a value in excess of $250. The answer to the question, as thus stated, is that unless we can specifically identify the property which must be suppressed, we cannot determine which items of property were validly presented to the jury. Furthermore, under the prosecution's own theory of measuring value, as most ably expressed in the prosecutor's closing jury arguments, the jury was required to find the requisite $250 value by combining the values of several items of stolen property. By their verdict, we know the jury did precisely that.

By removing some of the property, without identifying which items, we simply have no way of knowing how the jury would resolve the "value" issue, an essential element of the crime charged. However, consistent with the trial court's instructions, the jury could have found the defendant guilty of the lesser–included offense of possessing stolen property in the third degree (value less than $250), RCW 9A.56.170, without the necessity of resolving the value issue. Indeed, we know that the jury did resolve all other issues of the lesser–included offense against the interest of the defendant. Accordingly, we remand with direction to resentence Ms. Jones for the crime of possessing stolen property in the third degree. *See State v. Martell*, 22 Wn. App. 415, 591 P.2d 789 (1979).

The judgment and sentence is vacated and this cause is remanded for entry of judgment and sentence consistent with this opinion.

PEARSON, C.J., and REED, J., concur.